<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BARETTA BENTLEY and PERNELA HAYNES,

    Plaintiffs,

  v.

MILLENNIUM HEALTHCARE CENTERS II, LLC      Civ. No. 06-5939 (DRD)
d/b/a/ CAREONE AT DUNROVEN f/k/a
DUNROVEN HEALTHCARE CENTER, JOHN DOE      **O P I N I O N**
#1-5 and XYZ CORP. #1-5,

    Defendants.

*Appearances by:*

JOSEPH H. NEIMAN, Esq.
39 Hudson Street
Hackensack, NJ 07601

    *Attorney for Plaintiffs*

BUCHANAN INGERSOLL & ROONEY PC
Caroline J. Berdzik, Esq.
Kelly L. Bannister, Esq.
700 Alexander Park, Suite 300
Princeton, NJ 08540

    *Attorneys for Defendant*

<u>DEBEVOISE, Senior District Judge</u>

    On December 12, 2006, Baretta Bentley and Pernela Haynes (collectively, "Plaintiffs") each filed separate actions against Millennium Healthcare Centers II, LLC, doing business as

CareOne at Dunroven, formerly known as Dunroven Healthcare Center ("Dunroven"), alleging wrongful termination on the basis of their ages and breach of their contracts of employment. On July 18, 2007, the court consolidated these two actions. On October 22, 2008, Defendant moved for summary judgment dismissing all counts. On January 6, 2009, the parties stipulated to the dismissal of Plaintiffs' causes of action for breach of their employment contracts. For the reasons set forth below, Defendant's motion for summary judgment is granted and all remaining causes of action against Defendant are dismissed. On October 22, Defendant also moved in limine to strike the expert report and testimony of Dr. Edward Berger. Defendant's motion in limine is dismissed as moot.

## I. BACKGROUND[1]

The following facts are undisputed. In 1973, Ms. Bentley began her employment as a Certified Nurse's Aide ("CNA") at the nursing facility currently owned by Dunroven. Ms. Bentley worked for Dunroven's predecessors at that location until 2001, when CareOne at Dunroven acquired the facility and Ms. Bentley began her employment with Defendant. Ms. Haynes began her employment as a CNA with the Defendant's predecessor at the Dunroven facility in 1999 and began her employment with Defendant at the same location in 2001 when CareOne at Dunroven acquired the facility. Dunroven terminated the Plaintiffs' employment in December 2004. At that time, Ms. Bentley was earning $15.26 per hour and Ms. Haynes was earning $11.91 per hour.

---

[1] Unless otherwise noted, the facts in this section are undisputed. (See Def.'s Rule 56.1 Statement of Undisputed Facts and Pls.' Response to Def.'s Rule 56.1 Statement.)

A.   **Termination of Plaintiffs' Employment**

On December 15, 2004, Plaintiffs were working their regular shift – 3:00 p.m. to 11:30 p.m. – on the northwest wing of the Dunroven facility. Two other CNAs, Alta Marie Brutus and Marcia Grant, were working the same shift on the northeast wing. At about 9:45 p.m., Marie Istrophe, the CNA who was scheduled to work on the northwest wing for the shift from 11:00 p.m. until 7:00 a.m., called Dunroven and stated that she would be out sick that evening. At about 11:25 p.m., Norma Dempster, the CNA scheduled to work on the northeast wing for the shift from 11:00 p.m. until 7:00 a.m., had not yet arrived. When contacted, Ms. Dempster indicated that she had overslept and would be in shortly; she arrived at Dunroven at approximately 12:30 a.m.

Also around 11:25 p.m. that evening, Natay Grajales, a nurse, asked the Plaintiffs, Ms. Brutus, and Ms. Grant if they would be willing to stay past the end of their shifts. All four responded that they were not willing to stay. Ms. Haynes clocked out at 11:30 p.m., Ms. Brutus clocked out at 11:31 p.m., and both Ms. Grant and Ms. Bentley clocked out at 11:32 p.m. Because the facility was then short on CNAs on the northeast and northwest wings, the Director of Nursing Services, Michael Nelson, was informed of the situation and came to Dunroven to assist with the direct care of the residents as they awoke.

The following day, December 16, 2004, Defendant terminated the employment of all four CNAs (including Plaintiffs) who had left Dunroven the previous evening before the CNAs for the next shift had arrived. Ms. Bentley, Ms. Haynes, Ms. Brutus, and Ms. Grant received identical letters, signed by Mr. Nelson, informing them of the termination of their employment. At that time, all four CNAs were over the age of forty. Ms. Bentley, who was born on July 10,

1938, was 66 years old. Ms. Haynes, who was born on October 1, 1943, was 61 years old. Ms. Grant, who was born on August 29, 1959, was 45 years old, and Ms. Brutus, who was born on March 19, 1959, was also 45 years old.

**B.      Interviews with the Four CNAs**

On December 17, 2004, Ms. Bentley called Ron Clarendon, who was then the Vice President of Human Resources for Dunroven. Ms. Bentley claims that Ms. Brutus was with her when she called Mr. Clarendon. Ms. Bentley told Mr. Clarendon that they were fired for refusing "to work past their quitting time" and that they disputed the allegation. On the same day, Margot Domingo, the licensed nursing home administrator at Dunroven, and Helen Graca, human resources and accounts payable clerk at Dunroven, interviewed each of the four CNAs separately about what had happened on the evening of December 15, 2004. During the interviews, each of the four CNAs signed or drafted a written statement reflecting her account of the events of the evening of December 15, 2004 and her reason for not staying at Dunroven's facility until the CNAs for the next shift arrived.

*i.      Interview with Ms. Bentley*

In her interview with Ms. Domingo and Ms. Graca, Ms. Bentley agreed that at about 11:25 p.m. on December 15, a nurse had asked her to stay past 11:30 p.m. and that Ms. Bentley refused. She explained at her interview that she could not stay until the relief CNAs arrived because her blood pressure was high that evening and she needed to go home to take medication. Ms. Bentley claimed that a private duty nurse, who was not employed by Dunroven, took her blood pressure that evening. Defendant claims that it interviewed the private duty nurse and that the nurse did not recall taking Ms. Bentley's blood pressure that evening. Ms. Bentley did not

4

provide Dunroven with a note or other confirmation from the private duty nurse. During this litigation, neither party has produced a statement from the private duty nurse.

Ms. Bentley also claims that she telephoned her physician, Dr. Casser, on December 16, 2004, and that he doubled the dosage of her blood pressure medication at the time. (Bentley Dep. 66:7-22, Feb. 15, 2008.) It is undisputed, however, that the notes obtained by Defendant from Dr. Casser's office pursuant to an authorization signed by Ms. Bentley in discovery make no mention of an office visit, a telephone call from Ms. Bentley regarding her high blood pressure or an increase in the dosage of her high blood pressure medication any time proximate to December 15, 2004. There are also no records from a visit to the emergency room by Ms. Bentley. Most importantly, however, when Ms. Domingo and Ms. Graca interviewed Ms. Bentley, and in the days following the interview, when Dunroven was making the final decisions on the rehiring of any of the fired CNAs, Ms. Bentley did not provide a note or other confirmation from her doctor that she had spoken with him regarding her blood pressure at any time in the days before or after December 15, 2004. Ms. Bentley is unsure whether she worked her morning shift at her other job on December 16, 2004.

### ii.  *Interview with Ms. Haynes*

In her interview with Ms. Domingo and Ms. Graca, Ms. Haynes agreed that a nurse had asked her if she wanted to stay that evening and that she refused. The only reason Ms. Haynes provided during the interview regarding why she left was that she believed that she saw Ms. Dempster (the CNA for the next shift) at Dunroven. Ms. Dempster did not clock in until approximately 12:30 a.m. At her deposition in this case, Ms. Haynes first alleged that she could

not remain at Dunroven because her brother, who was to provide her with a ride home that evening, had arrived to take her home.

### iii.     *Interview with Ms. Grant*

In her interview with Ms. Domingo and Ms. Graca, Ms. Grant claimed that she had a very bad asthma attack on December 14, 2004, and that Defendant's scheduler had called her on the morning of December 15 to ask her to work overtime on an earlier shift but that she had declined because she did not feel well.  Ms. Grant admitted that around 11:28 p.m. that evening a nurse asked her to work overtime but that she explained to the nurse that she could not do so because she was not feeling well and was having tightness in her chest.  After her interview, Ms. Grant contacted her physician, Dr. Vladimir Kilinsky, to obtain a note regarding her visit to his office.  On December 22, 2004, Defendant received a facsimile from Dr. Kilinsky, which indicated that Ms. Grant had been seen in his office on December 15, 2004.

### iv.     *Interview with Ms. Brutus*

During her interview with Ms. Domingo and Ms. Graca, Ms. Brutus also admitted that a nurse had asked her if she could stay at Dunroven on the evening of December 15, 2004.  Ms. Brutus told Ms. Domingo and Ms. Graca that when asked to stay past 11:30 p.m. on that evening, she had informed the nurse that she could not stay because she had younger children at home, ages 13 and 14.  She explained that her young children were cared for by her older son— age 18—while Ms. Brutus was at work, but that her older son left for work around the same time that Ms. Brutus returned home from work.  At her deposition in this case, Ms. Brutus testified that she was particularly concerned about leaving her minor children at home alone because she was aware of other parents whose children had been taken away from them for that reason, and

6

because people in her neighborhood closely watched who came and left her home.  Ms. Graca testified that she was aware of Ms. Brutus's concerns regarding leaving her children at home alone because she had previously helped Ms. Brutus fill out paperwork for an investigation by the Department of Youth and Family Services ("DYFS") after one of Ms. Brutus's neighbors called the police to report that Ms. Brutus's young children were at home alone.  During her deposition, however, Ms. Brutus denied that there was a time when a DYFS complaint was made against her concerning her children.

**C.     Rehiring of Ms. Grant and Ms. Brutus**

Following these interviews, Mr. Clarendon, Ms. Graca and Ms. Domingo discussed the information learned during the course of the investigation with respect to why each CNA did not remain at the facility when asked by a nurse supervisor to do so.  During these discussions, no mention was ever made of the ages of the four CNAs whose employment was terminated.  Thereafter, a decision was made to reinstate Ms. Brutus and Ms. Grant, but not Plaintiffs, to their positions.  Defendant alleges that this decision was based on the fact that Ms. Brutus and Ms. Grant had provided verifiable information regarding their inability to remain at work on December 15, 2004 until relief staff arrived.  Plaintiffs argue that Ms. Brutus never provided any verifiable information, but the parties agree that when Ms. Grant was notified that she had been rehired, she was informed that the reason was related to her ability to provide proof that she had been to see her doctor earlier in the day on December 15, 2004.

## II.  DISCUSSION

A.  **Standard of Review for Summary Judgment**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary. Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is

a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Plaintiffs' ADEA & NJLAD Claims**

Under the Age Discrimination in Employment Act ("ADEA"), it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protection against age discrimination in the ADEA is "limited to individuals who are at least 40 years of age." Id. § 631(a). The New Jersey Law Against Discrimination ("NJLAD") affords similar protection, but does not limit the age restriction to forty years. Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 300 (3d Cir. 2004).

In this case, the Plaintiffs allege that they have suffered age discrimination predicated on disparate treatment (as opposed to disparate impact). When, as here, a plaintiff lacks direct evidence of discrimination, the Court of Appeals has held that she may meet her burden by presenting indirect evidence of discrimination that satisfies the three-step burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Monaco, 359 F.3d at 300; Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004); Fakete v. Aetna, Inc., 308 F.3d 335, 337-38 (3d Cir. 2002). The same burden shifting framework is applied to claims brought under the both the ADEA and the NJLAD. Dooley v. Roche Lab Inc., 275 Fed. Appx. 162, 164 (3d Cir. 2008).

Under the burden shifting framework from McDonnell Douglas, the plaintiff must produce sufficient evidence to convince a reasonable factfinder as to all the elements of a prima

facie case of discrimination.  If a plaintiff does establish a prima facie case, then the burden of production shifts to the defendant to show that there was a legitimate, nondiscriminatory explanation for the adverse employment decision.  If the defendant makes such a showing, the plaintiff must submit evidence that that explanation is pretextual, i.e., evidence from which a factfinder could reasonably disbelieve the employer's articulated reason(s), or believe that an invidious discriminatory reason was more likely than not a determinative factor (i.e., a "but for" factor) in the employer's action.  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994); Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 215 (3d. Cir. 2000).  The plaintiff must prove that age was "a determinative factor of the employment decision, meaning that she would not have been terminated but for her [age]."  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 n.8 (3d. Cir. 2007).  To establish that the explanation is pretextual, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"  Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) and Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)(internal citation omitted)).  "While this standard places a difficult burden on the plaintiff, '[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs.'"  Id. (quoting Ezold, 983 F.2d at 531).

In an ordinary employment termination case under the ADEA,[2] to satisfy the first step of the McDonnell Douglas burden shifting framework—the establishment of a prima facie case of age discrimination—a plaintiff must demonstrate that she: "(1) was a member of the protected class, i.e., was over 40, (2) was qualified for the position, (3) suffered an adverse employment decision, and (4) ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." Monaco, 359 F.3d at 300; Potence, 357 F.3d at 370. The fourth prong of the required prima facie showing is slightly modified when the case arises in the context of a reduction in force or there is no evidence that anyone was hired in place of plaintiff. In such a case, rather than show that the employer replaced the plaintiff with a person sufficiently younger, the plaintiff must show that the employer "retained a sufficiently younger similarly situated employee." Monaco, 359 F.3d at 301; Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002).

The Court of Appeals discussed at length what "similarly situated" means in Monaco:

> [A]n individual does not need to be situated identically to satisfy the fourth element of a plaintiff's prima facie case . . . . In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner.

---

[2] In general, the requirements to establish a prima facie case of wrongful termination based on age discrimination under the NJLAD are essentially the same as those under the ADEA: "a plaintiff must demonstrate that he or she: (1) belongs to a protected class, (2) was qualified for the position held, (3) was terminated despite adequate qualifications," and "(4) was replaced with a candidate sufficiently younger to permit an inference of age discrimination." Monaco, 359 F.3d at 301; id. at 304 ("[W]e are satisfied that we should apply the same standard for the fourth element of [plaintiff's] prima facie case under the NJLAD as we would have applied under the ADEA if he had brought his case under that statute.").

Monaco, 359 F.3d at 305.[3]

### i.   *Prima Facie Case*

Ms. Bentley and Ms. Haynes both easily satisfy the first three prongs of the four prong test to establish a prima facie case. At the time they were fired, both Ms. Bentley and Ms. Haynes (1) were over the age of 40; (2) were qualified for the positions they held and from which they were fired; and (3) suffered an adverse employment decision. Whether Plaintiffs satisfy the fourth prong of the test—that the employer retained a sufficiently younger employee who was also similarly situated—is a closer question. At the time they were fired from Dunroven, Ms. Bentley and Ms. Haynes were 66 and 61 years old, respectively. The two CNAs who were retained (or fired and rehired) were both 45 years old, or at least 16 years younger than the Plaintiffs, so they were "sufficiently younger." As the Court of Appeals explained in Monaco, in order to assess whether employees were "similarly situated," we must examine "job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." 359 F.3d at 305. All four women who were fired had the same job function and supervisory responsibility – they were all CNAs who worked the same shift at Dunroven. There is no allegation by either the Plaintiffs or the Defendant that the CNAs performed different tasks or had differing levels of responsibility as CNAs, or were compensated at levels sufficiently different such that they would not be similarly situated. Additionally, all four CNAs were asked to stay, refused to do so, and were fired the next day. All four received

---

[3] The plaintiff in Monaco brought his claim not under the ADEA, but under the NJLAD. In explaining the standard for establishing that an employee is "similarly situated" under the NJLAD, however, the Court of Appeals did "not suggest that the standard would be different under the ADEA." 359 F.3d at 305 n. 12.

identical letters from Mr. Nelson. All four were interviewed by Ms. Domingo and Ms. Graca and were given the opportunity to explain why they left before the relief CNAs arrived.

Defendant argues, however, that Ms. Grant and Ms. Brutus were not "similarly situated" to the Plaintiffs because they provided verifiable or substantiated excuses regarding why they left Dunroven before the relief CNAs arrived, while the Plaintiffs did not. Defendant quotes an unpublished decision from the Court of Appeals, Davis v. City of Philadelphia Water Department, 57 Fed. Appx. 90, 92 (3d Cir. 2003), which stated that, in order to be "similarly situated," an individual must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." (Def.'s Summ. J. Br. 12.) The focus in Davis, however, was on the behavior for which the plaintiff and his alleged comparators were disciplined. The plaintiff was fired for "uttering racially charged obscenities at a supervisor" and making death threats against the supervisor. David, 57 Fed. Appx. at 92. The alleged comparators were disciplined for "short-lived, non-racial flare-ups during disagreements with other non-supervisory employees." Id. In this case, the behavior for which all four CNAs were fired was the same. In fact, everything about their situations was the same except for their reasons given for not staying until the relief CNAs arrived and the level of verification of those reasons. While this difference is important in the context of the Defendant's burden to produce a legitimate non-discriminatory reason for not rehiring Plaintiffs, it is not sufficient to establish that Ms. Grant and Ms. Brutus were not similarly situated to the Plaintiffs. The comparators need not be identically situated, just similarly. Thus, Plaintiffs have satisfied the fourth prong of the McDonnell Douglas test and have made a prima facie case of discrimination.

### ii. *Legitimate Non-Discriminatory Reason*

"The employer satisfies its burden of production [of a legitimate non-discriminatory reason] by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes, 32 F.3d at 763. Defendant claims that its legitimate, non-discriminatory reason for its decision to rehire Ms. Grant and Ms. Brutus, but not the Plaintiffs, is that Ms. Grant and Ms. Brutus provided "verifiable" excuses for their failure to remain at Dunroven until the relief CNAs arrived, while the Plaintiffs did not. It is undisputed that the Defendant interviewed all four CNAs regarding the evening of December 15, 2004. During the interviews, each CNA signed or drafted a written statement reflecting her account of the events of that evening and her reason for leaving the facility before the CNAs for the next shift arrived. They were given equal opportunities to explain their reasons for leaving before the relief CNAs arrived. Ms. Grant provided a note from her doctor. Ms. Brutus explained that she had to go home so that her young children would not be left alone, and one of the persons conducting the interviews, Ms. Graca, was aware of some previous issues Ms. Brutus had regarding her children. Although Ms. Bentley also claimed to have a medical excuse, she provided no substantiation from her doctor or from the nurse whom she claimed had taken her blood pressure. The only excuse provided by Ms. Haynes at that time for her failure to stay was that she thought she saw one of the relief CNAs arrive.

Dunroven's explanation that Ms. Brutus and Ms. Grant provided verifiable excuses and the Plaintiffs did not is sufficient to meet its low burden of production that the Defendant had a non-discriminatory reason for refusing to rehire Ms. Bentley and Ms. Haynes.

### *iii.     Pretext*

Plaintiffs claim that the Defendant's reason for not rehiring Ms. Bentley and Ms. Haynes is pretextual.  Plaintiff's primary argument in support of its assertion that Defendant's reason is pretextual is that there is inconsistent and confusing testimony from Dunroven's employees regarding exactly who made the decision not to rehire the Plaintiffs.  These inconsistencies, Plaintiffs argue, rise to the level of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them unworthy of credence and hence infer that the employer did not act for non-discriminatory reasons."  Fuentes, 32 F.3d at 765 (internal quotations and citation omitted).  For example, in the deposition testimony included in Plaintiffs' brief, the licensed nursing home administrator at Dunroven, Margo Domingo, testified that Ron Clarendon, the (former) Vice President of Human Resources for Dunroven, "suggested" that Ms. Grant and Ms. Brutus be rehired, but not Plaintiffs, and that this was "per agreement with Michael Nelson and me."  (Pls.' Opp'n Br. 8.)  Ms. Domingo explained that Mr. Clarendon's stated reason for this decision was that Ms. Grant's and Ms. Brutus's reasons for not staying that evening were "valid" while Plaintiffs' reasons were not.  (<u>Id.</u>)  Plaintiffs also cite to testimony where she stated that she and Mr. Nelson would have made the decision to rehire two CNAs, but that she could not recall making that decision.  (<u>Id.</u> 10-11.)  In other testimony from Ms. Domingo, she seems to indicate that she thought that Mr. Clarendon and Mr. Nelson recommended that Ms. Grant and Ms. Brutus be rehired, or possibly that Mr. Nelson just followed the recommendation from Mr. Clarendon.  (<u>Id.</u> 11.)  Later in her testimony, when asked whether she recalled that after the investigation of the incident on December 15, 2004, Ms. Grant

and Ms. Brutus still had jobs with Dunroven while Ms. Bentley and Ms. Haynes did not, Ms. Domingo responded, "That's why a little bit of my recollection I think two of they were restated (reinstated) is what I mentioned earlier, I don't know who is who." (Id.)

In addition to Ms. Domingo's internally inconsistent testimony regarding exactly who made the decision not to rehire Ms. Bentley and Ms. Haynes, Plaintiffs point to testimony of various other witnesses that seem to contradict each other. Mike Nelson testified that corporate made "the decision" – though it is unclear from the testimony provided in Plaintiffs' brief exactly which decision (firing all four CNAs or rehiring two of them) Mr. Nelson meant. (Id. 12.) Ms. Graca also testified that the decision was "the corporate office's decision;" this portion of her testimony seems to relate to the initial decision to terminate the employment of all four CNAs. (Id. 12.) Mr. Clarendon testified that Ms. Domingo and the (former) Regional Director of Operations, Mike Munter, made the decision regarding which CNAs to rehire and that he did not participate in the final decision. (Id. 13.) Mr. Munter testified that he did not recall if he played any role in the decision to terminate the employment of all four CNAs or the decision to rehire two of them. (Id. 14.)

While many of Dunroven's witnesses seem to be confused about the events surrounding the termination and/or rehire of the CNAs, the inconsistencies and confusion within the testimony of Dunroven's witnesses seem to stem only from their inability to recall events that occurred over four years ago. Essentially, the only confusion is that no one remembers who did what. There is not a hint, however, in any testimony cited by Plaintiffs that age had anything to do with the decision not to reinstate Ms. Bentley and Ms. Haynes. Further, Plaintiffs have not pointed to any inconsistencies in the testimony of Dunroven's witnesses regarding the reason for

not rehiring Ms. Bentley and Ms. Haynes.  The testimony is consistent that all four CNAs were initially fired; Dunroven then conducted an investigation into each CNA's reason for leaving work before the relief CNAs arrived; and the decision regarding which CNAs to reinstate was made based upon the reasons given by each CNA for leaving early and any corroboration of those reasons.  Given the absence of any evidence to support that Dunroven discriminated against Plaintiffs on the basis of their ages, the inconsistencies in the testimony of Dunroven's witnesses are not sufficient for a factfinder to reasonably disbelieve Dunroven's articulated reasons or to believe that an invidious discriminatory reason was a determinative factor in Dunroven's decision not to re-instate Ms. Bentley or Ms. Haynes.

     Similarly, Plaintiffs argue that a fatal weakness in the Defendant's articulated reason for not rehiring the Plaintiffs is that the Defendant cannot point to a single individual who made the decision not to rehire the Plaintiffs.  While the testimony of Dunroven's witnesses is certainly unclear on who exactly made the decision to fire the four CNAs and not to rehire the Plaintiffs, there is no requirement that the decision to fire an employee be made by a single individual, and, again, Plaintiffs have not pointed to any inconsistencies in the testimony of Dunroven's witnesses regarding the <u>reason</u> for not rehiring Ms. Bentley and Ms. Haynes.  There is no reason to believe that the fact that the decisions to fire the four CNAs and not to rehire the Plaintiffs seem to have been made by a group of people, rather than an individual, is evidence that age played any factor in the decision.

     Plaintiffs also attack the sufficiency of the investigation Dunroven conducted after it initially fired the four CNAs.  In particular, Plaintiffs argue that Dunroven should have a signed statement from the private duty nurse that Ms. Bentley claims took her blood pressure that

evening.  During her interview with Ms. Domingo and Ms. Graca on December 17, 2004, Ms. Bentley signed a statement saying that she could not stay past 11:30 p.m. at Dunroven on December 15, 2004 because her blood pressure was high.  In support of her allegation, Ms. Bentley claimed that a private duty nurse (i.e., a nurse not employed by Dunroven) took her blood pressure.  Defendant claims that it followed up on Ms. Bentley's claim by interviewing that private duty nurse, but that the nurse said she did not recall taking Ms. Bentley's blood pressure that evening.  (See Def.'s Rule 56.1 Statement of Undisputed Material Facts ¶ 32.) Plaintiffs dispute that Defendant interviewed the private duty nurse because "there was no statement from any private duty nurse, nor was there any name even provided."  (Pls.' Response to Def.'s Rule 56.1 Statement ¶ 3.)  Plaintiffs fail to point to any facts, however, that create a genuine issue regarding this statement.  The two documents to which Plaintiffs cite in support of their dispute of this statement, Ms. Bentley's Affidavit and Ms. Bentley's signed statement from her interview on December 17, 2004, make no mention of the private duty nurse and are thus not sufficient to dispute the Defendant's claim that it interviewed the private duty nurse.  It is undisputed that Ms. Bentley did not provide any additional verification to Dunroven of her excuse for leaving that evening; she did not provide a statement from the private duty nurse whom she claimed in her interview had taken her blood pressure that evening, nor did she provide a note from her doctor, whom she claimed, during her deposition, that she had called on December 16, 2004 and who had told her to double the dosage of her blood pressure medication.  (Bentley Dep. 66:7-22, Feb. 15, 2008.)

     In contrast, Ms. Grant, the other CNA who provided a medical excuse as her reason for leaving before the relief CNAs arrived, did provide verification of her excuse in the form of a

doctor's note.  There is no evidence that she was ever asked to provide such a note.  And it is undisputed that when Ms. Grant was notified that she had been rehired, she was informed that the reason was related to her ability to provide proof that she had been to see her doctor earlier in the day on December 15, 2004.

      Plaintiffs also allege that Dunroven's verification of Ms. Brutus's excuse for leaving before the relief CNAs arrived was inadequate.  Ms. Brutus claimed in her interview with Ms. Domingo and Ms. Graca that she was unable to stay until the relief CNAs arrived on December 15, 2004 because she had to get home so that her minor children would not be at home alone when her son left for work.  Ms. Graca testified that she was aware at the time of Ms. Brutus's concerns regarding leaving her children at home alone because she had previously helped Ms. Brutus fill out paperwork for a DYFS investigation.  Although Ms. Brutus denied during her deposition in this matter that there had ever been a DYFS complaint against her concerning her children, Plaintiffs do not dispute Ms. Graca's recollection of having helped Ms. Brutus prepare DYFS paperwork in the past.[4]  Whether or not there was ever a formal DYFS complaint against Ms. Brutus, Ms. Graca's and Ms. Brutus's testimony are not contradictory:  both testified that they were aware of or had concerns related to leaving Ms. Brutus's children home alone.  Even if Ms. Graca's belief that she had helped Ms. Brutus with DYFS paperwork in the past was

---

[4] Paragraph 27 of Def.'s Rule 56.1 Statement of Undisputed Material Facts reads, "Brutus' minor children being home alone was of particular concern to Brutus as she was aware of others who had problems with losing their children and was aware that people in her neighborhood would closely watch who came and left her home.  Indeed, defendant was aware of an issue Brutus has with DYFS, as Graca recalled having helped Brutus prepare DYFS paperwork in the past." (internal citations omitted.)  In response, Plaintiffs stated only that "Plaintiffs dispute statement number 27."  Pls.' Response to Def.'s Rule 56.1 Statement ¶ 1.  In support of their statement, however, Plaintiffs cite only to Brutus's deposition testimony where she denies having had a DYFS complaint made against her.


incorrect, a good faith reliance on a mistaken belief is insufficient to establish pretext. See Fuentes, 32 F.3d at 765. Indeed, even if Dunroven's entire investigation were inadequate, that fact alone would not be sufficient evidence to raise an inference of pretext. Because Plaintiffs point to no other evidence that the Defendant's reason for not rehiring Ms. Bentley and Ms. Haynes is pretextual, Plaintiffs have not met their burden of proving pretext.

## IV.  CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment will be granted. Defendant's motion in limine is dismissed as moot. The Court will enter an order implementing this opinion.

                                      s/ Dickinson R. Debevoise
                              DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: January 21, 2009